# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| VISTO CORP. | § | |
| | § | |
| vs. | § | CASE NO. 2:06-CV-181 |
| | § | |
| RESEARCH IN MOTION LTD, ET AL. | § | |

## MEMORANDUM OPINION AND ORDER

## 1.    Introduction

In this case, Visto Corporation ("Visto") contends that the defendants, Research in Motion, Limited, and Research in Motion Corporation (collectively "RIM") infringe various claims of five United States patents, and RIM contends that Visto infringes various claims of two United States patents.  In this regard, Visto is asserting U.S. Patent Nos. 6,023,708 ("the '708 patent), 6,085,192[1] ("the '192 patent"), 6,708,221 ("the '221 patent"), 7,039,679 ("the '679 patent"), and 6,151,606 ("the '606 patent") (collectively "the Visto patents-in-suit), and RIM is asserting U.S. Patent Nos. 6,219,694 ("the '694 patent") and 6,389,457 ("the '457 patent") (collectively "the RIM patents-in-suit").  This opinion and order resolves the material claim construction disputes between the parties.

## 2.    General Principles Governing Claim Construction

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999).  Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

---

[1]    The '192 patent is subject to an *ex parte* reexamination certificate, which issued on November 22, 2005.

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. Under the patent law, the specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). And, although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312 (emphasis added) (quoting *Innova/Pure Water, Inc. v. Safari Water*

*Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  To that end, the words used in a claim are generally given their ordinary and customary meaning.  *Id.*  The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application."  *Id.*  at 1313.  This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention.  The patent is addressed to and intended to be read by others skilled in the particular art.  *Id.*

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id.*  Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument."  *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978).  Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims.  *Id.* at 1314-17.  As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims."  *Bates v. Coe*, 98 U.S. 31, 38 (1878).  In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.  The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. The prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Phillips*, 415 F.3d at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence. That evidence is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims.

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Id.* at 1319-24. The approach suggested by *Tex. Digital*–the assignment of a limited role to the specification–was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id.* at 1320-21. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of the claim terms within the context of the patent." *Id.* at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.* What is described in the claims flows from the statutory requirement

imposed on the patentee to describe and particularly claim what he or she has invented. *Id.* The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id.* at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id.* at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

3.    **Discussion of Terms**

A.    **The Visto Patents-in-Suit**

The Visto patents-in-suit are related to one another and are directed to data synchronization methods and systems. The '679 patent is a continuation of the '221 patent, and those patents share a common written description.[2] The '221 patent is related to the '708 and '192 patents, which are also related to the '606 patent. Three of the patents-in-suit have been previously construed in two separate litigations by the Honorable T. John Ward, U.S. District Judge for the Eastern District of Texas–Marshall Division. *See Visto Corp. v. Seven Networks, Inc.*, No. 2:03-CV-333 (E.D. Tex. Apr. 20, 2005, Apr. 18, 2006); *Visto Corp. v. Smartner Info. Sys., Ltd*., No. 2:05-CV-091 (E.D. Tex. Dec. 29, 2006). In each of those previous litigations, Judge Ward construed terms from the '192,

---

[2]      The claims of the '221 patent are drawn to a method for synchronizing workspace data, and the claims of the '679 patent are drawn to an e-mail system for providing synchronization of independently modifiable emails.

'221, and '708 patents, along with one other patent not at issue in this litigation.  Several claim terms in the '192, '221, and '679 patents have also been construed by the Honorable David Folsom, U.S. District Judge for the Eastern District of Texas.  *See Visto Corp. v. Microsoft Corp.*, No. 2:05-CV-546 (E.D. Tex. Aug. 28, 2007).  Finally, the undersigned has more recently construed several claim terms from the '192, '221, '606, and '679 patents.  *See Visto Corp. v. Good Tech., Inc.*, No. 2:06-CV-039 (E.D. Tex. Jan. 16, 2008).

The '192 patent is directed to methods and systems for synchronizing multiple copies of a workspace element in a secure network environment.  '192 patent at 1:52-54.  The secure network environment includes a global server connected to multiple clients.  *Id.* at 1:54-55.  Clients using the system and method can automatically synchronize workspace data between multiple sites independent of whether the sites are protected by site firewalls.  *Id.* at 1:56-59.

The system described in the '192 patent includes a general synchronization module at the client site for operating within a first firewall and for examining first version information to determine whether a first workspace element has been modified.  The system further includes a synchronization agent at the global server for operating outside the first firewall and for forwarding to the general synchronization module second version information which indicates whether an independently modifiable copy of the first workspace element has been modified.  The system includes means for generating a preferred version from the first workspace element and from the copy by comparing the first version information and the second version information, and means for storing the preferred version at the first store and at the second store.  *Id*. at 1:60-67, 2:1-15.

Figure 1 depicts an overall system and includes a remote terminal linked to a global server protected by a global firewall.  The global server, in turn, is linked via a communications channel

to a corporate LAN protected by a corporate firewall.  One copy of workspace data, such as e-mail information, file information, and calendar information, is stored on the global server and may be modified through the remote terminal by accessing the global server.  The global server stores version information which indicates the date and time that the workspace data has been modified.

Figure 3 of the patent depicts a desktop computer on the LAN, with workspace data (called "user data" in the drawing), as well as corresponding version information.  In the drawing, the version information is depicted as a component of the user data stored in memory.  The computer includes a base system loaded into RAM, along with the operating system and the desktop service engine.  Figure 4 describes the base system as including various software modules.  The base system includes a communications module for communicating through the communications interface shown in Figure 3.  The base system also includes a user interface module with routines for communicating with a user such as through a graphical user interface.  A locator module is also a component of the base system.  That module includes code for determining the location in memory of workspace elements (subsets of workspace data).

The data synchronization process is initiated by the synchronization-start module.  The '192 patent explains, through its description of the preferred embodiment, that synchronization may occur at predetermined times, such as start-up, shut-down, or timed intervals.  The process begins when the general synchronization module issues a request from inside the LAN to a synchronization agent on the global server outside the LAN.  The synchronization agent examines version information of an independently modifiable copy of workspace data stored on the global server and forwards back to the general synchronization module inside the LAN the version information of that data determined to be modified after the last synchronization.  The general synchronization module has

routines for examining version information from the workspace data stored inside the LAN and comparing it to the version information forwarded by the synchronization agent to determine, ultimately, a preferred version of the data. The software has routines which then store the preferred version in memory in both locations.

To handle the situation where both the version information stored on the LAN and the independently modifiable copy of the version information stored on the global server have been modified since the last synchronization sequence, the base system includes a content-based synchronization module. This module includes routines which may, for example, prompt the user to select a preferred version, integrate the content of both changes, or store both versions at both memory locations.

The '192 patent refers to a global server protected by a global firewall. The global server stores an independently modifiable copy of workspace data. In the invention described in the '221 and '679 patents, a user can gain secure access from a remote terminal to a global server using any terminal coupled through a communications channel (such as the Internet) to the global server. The global server, in turn, is coupled through a communications channel to a LAN.

In the description of the preferred embodiment of the '221 and '679 patents, a remote user seeks to access a service available on the global server. The global server might provide, for example, an email service accessible from a remote terminal located outside the LAN. To access the e-mail service, the remote user initiates a communications link with the global server. The server downloads a security applet to the remote terminal.[3] '221 Patent at 8:47-49. The applet polls

---

[3]     An applet is a small, self-contained program designed to be executed from within another application.

the remote user for information and responds back to the global server, which examines the response and uses the information to identify and authenticate the user. *Id.* at 8:50-54.  Once the user is "in," so-to-speak, he or she may then securely access the services provided on the global server. Depending on the level of security clearance enjoyed by the remote user, the system also describes an optional procedure for using the global server as a proxy to access the various services.

The global server incorporates a translator to aid in synchronizing multiple copies of workspace data.  The patent refers to the translator as a "global translator."  By using the global translator, the global server is able to store certain workspace data in a "global format" and may also determine the differences between workspace data stored on the LAN and the data stored in memory on a remote access device, such as a smart phone.  Using the synchronization routines provided by software, clients on the system are able to synchronize data maintained on the remote device, the global server, and the storage on the LAN.

As indicated, the global server described in the '221 patent refers to a global translator.  The invention claimed by the '708 patent involves a translator used to maintain data consistency when a system synchronizes data stored in different formats at different locations.  In the Background of the Invention, the inventors observe that data consistency problems may arise when using application programs from different vendors.  A user who uses the Netscape Navigator browser at home, but the Internet Explorer browser at work, may have bookmarks saved in two different formats.  Because the programs store the bookmarks in different formats and in different folders, the user runs the risk of having inconsistent bookmarks at each location.  The invention of the '708 patent describes a global translator used to maintain data consistency when workspace data is stored in different formats.

9

In the preferred embodiment, workspace data may be stored in a corporate LAN in Format A.  Workspace data may also be stored in Format B on a remote terminal.  '708 Patent, Fig. 1, 3:29-47.[4]  The remote terminal is coupled through a communications channel to a global server, to be easily translatable by the translator to and from Format A and to and from Format B.  The global translator incorporates all of the information needed by both formats (Format A and Format B) to create the global format.  For example, if a bookmark in Format A needs elements X, Y, and Z, and a bookmark in Format B needs elements W, X, and Y, then the global translator incorporates all four elements (W, X, Y, and Z) to create a bookmark in the global format.  In addition, the global translator incorporates into the global format of the workspace element (in this case, the bookmark) all of the information needed by the synchronization means, such as the last modified date.[5]

As illustrated in the flowchart of Figure 7, the process begins when a user selects a workspace element of workspace data to synchronize.  The locator modules determine the memory location of the workspace elements in Format A, Format B, and the global format.  The general synchronization modules in the base system on the LAN and on the global server determine, by comparing the last date and type of modification with the last synchronization signature, whether any workspace elements stored in either location have been modified.  Working in conjunction with the base systems and synchronization modules of the remote device and the base system and synchronization module on the LAN, the global translator is able to translate the updated versions

_____

[4]        The patent makes clear that one of skill in the art would also understand that each different type of workspace data (bookmarks, e-mails, documents, etc.) could be maintained in a different format in each of the locations.  '708 Patent at 3:36-41.

[5]        Thus, as illustrated in Figure 6 of the patent, a bookmark in the global format includes a user identification, an entry ID, a parent ID, a folder ID flag, a name, a description, the Uniform Resource Locator, the position, a deleted ID flag, a last modified date, a created date, and a separation ID flag.

into the formats used by the remote device and on the LAN.  The system then stores the updated information at both locations, as well as in the global format on the global server.  By doing so, the invention described by the '708 patent maintains data consistency when synchronizing multiple versions of workspace data maintained in different locations in different formats.

The '606 patent describes a system for using a single interface, *i.e.* the workspace data manager, to access, manipulate, and synchronize workspace data, such as from a remote location. *Id.* at 2:9-11, 2:54-59.  The workspace data manager may include a personal information manager (PIM) or any application program that enables manipulation of workspace data.  *Id.* at 2:11-16.  The system generally includes a communications module for downloading workspace data from a remote site, an application program interface for communicating with a workspace data manager, and a general synchronization module for synchronizing the manipulated data with the workspace data stored at the remote site.  *Id.* at 2:21-29.   An instantiator requests the workspace data manager to provide an interface for enabling manipulation of the workspace data that downloaded to a remote client.  *Id.* at 29-31.  Upon logout from the remote client, a de-instantiator initiates synchronization and deletes the locally stored data and interfaces from the local client, so that no traces are left on the local client for unprivileged users to review.  *Id.* at 2:40-42, 3:7-9.

## 1. Previously Construed Terms

As discussed above, many of terms in the Visto patents-in-suit have been previously construed as part of previous litigations involving Visto.  The court has carefully reviewed these prior constructions in view of RIM's current claim construction arguments and concludes that the previous constructions are correct.  The court therefore adopts the following constructions from previous litigations.

11

| Term | Court's Construction |
|---|---|
| untrusted client site | the court concludes this term is definite and adopts the court's previous construction of "a computer that is outside the firewall which is accessible to unprivileged users" |
| automatically disabling the untrusted client site from accessing at least a portion of the downloaded data | preventing, without a user request to do so, the untrusted client site from accessing at least a portion of the downloaded data after a user has finished using the data |
| after a user has finished using the data | the court concludes this term is definite and adopts the court's previous determination that this term needs no further construction |
| workplace element | a subset of workspace data such as an e-mail, file, bookmark, calendar, or applications program which may include version information |
| independently modifiable copy | a copy of a workspace element capable of being modified independent of the workspace element. The copy of the workspace element does not have to be in the same format as the workspace element |
| translating | converting information or data in one format to information or data in another format |
| translator | software routines or code that convert information or data in one format to information or data in a second format |
| version information | information that can be used to determine the version of a workspace element |
| HTTP Port and SSL Port | any port that is used to transfer information or communicate using Hyper Text Transfer Protocol (HTTP) and any port that is used to transfer information or communicate using Secure Sockets Layer (SSL) protocol |
| examination results | information regarding one or more workspace elements obtained by examining those workspace elements.  The terms "first" and "second," when modifying "examination results" require no construction. |

| Term | Court's Construction |
|------|---------------------|
| smart phone | a telephone device that integrates computing capabilities and telephone capabilities |
| storing the preferred version at the first store and at the second store | actively storing the preferred version at the first and second store. The court adopts the order of steps of the method claims as discussed in *Visto Corp. v. Good Tech, Inc.*, 2:06-CV-039, slip op. at 9-10 (E.D. Tex. Jan. 16, 2008). As such, the step of "storing the preferred version" is interchangeable with the step of "generating a preferred version." |
| global server | a server accessible from remote locations which stores independently modifiable copies of selected portions of workspace data |
| Internet | a network that connects other networks, such as corporate, university, and government networks |
| communicating | transmitting or transferring information |
| normally open LAN firewall port | a port that is typically configured to be open for packet traffic in a firewall. Port 80 and 443 are examples of normally open ports. |

**2.     determining differences; determining differences between the first workspace data and the second workspace data**

The parties urge the undersigned to adopt Judge Ward's construction of the term "differences" as "one or more distinctions between information or values contained in sets of data," as well as Judge Ward's construction of the term "workspace data" as "data, including corresponding version information, which may include e-mail data, file data, calendar data, user data, etc. Workspace data may also include other types of data such as applications programs." *See Visto Corp. v. Seven Networks, Inc.*, No. 2:03-CV-333, slip op. at 13, 19-20 (E.D. Tex. Apr. 20, 2005). Visto contends that "determining differences" needs no further construction in view of Judge Ward's previous constructions. RIM contends that "determining differences" should be construed

to mean "comparing data on one device with data on another device to identify any distinctions between them." RIM's proposed construction requires the comparison of data between two devices. RIM suggests that this limitation is supported by the claim language, as well as other portions of the '221 specification. The court disagrees. In this regard, the '221 specification states that "determining the changes made may be implemented by comparing the current status of the workspace element against the previous status of the workspace element as of the last interaction there between." '221 Patent at 15:30-34. This excerpt does not require the determination of changes by comparing the data that are stored on two devices. Rather, the determination of changes may be accomplished by comparing the current status of a workspace element against its previous status. Neither the specification or the claims require the storage of status information on separate devices or the comparison of data stored on two devices.

Additionally, the applicants' statements made during prosecution of the '221 patent to distinguish the Salesky reference do not serve as a clear disavowal of claim scope. The Salesky reference discloses a video conferencing system where differences between first and second blocks of data are determined in order to trigger the re-broadcasting of content from the presenter's screen to the screens of the remote participants. In distinguishing this reference, the patentees stated:

> Salesky quite simply teaches sending ALL of a first device data to a second device, which data is captured from the first device display, while the present invention at least contrastingly DETERMINES DIFFERENCES between first and second device workspace data and stores at the global server and sends to the second device only the DIFFERENCES.

Amendment and Response mailed July 2, 2003, at 9-10 (capitalization and underlining in original). RIM contends that these statements, as well as other similar statements made during prosecution, serve to disclaim embodiments where workspace data differences are determined on a single device.

14

In this regard, RIM relies on Salesky's disclosure of the determination of differences between the first and second blocks of data that are stored on a common device.  Although RIM's interpretation of these statements are consistent with certain embodiments of the invention, the court rejects RIM's view because it fails to appreciate the entirety of the claimed invention as a whole.  Moreover, the statements made by the applicants do not serve as a clear disavowal of claim scope because they may be read as distinguishing the types of systems at issue and in any event do not require the comparison of data or workspace elements.  In light of the above, the court adopts Judge Ward's previous constructions for the terms "differences" and "workspace data," and concludes that no further construction of "determining differences" is necessary.

### 3.     storing the differences; sending the differences

These terms appear in claim 8 of the '221 patent.  Claim 8 is a means-plus-function claim which requires, among other limitations, a "means for storing the differences at a global server" and a "means for sending the differences from the global server to the second device."  Visto contends that these terms do not need further construction in light of the court's construction of the term "differences."   RIM contends that "storing the differences" means "storing only the differences," and that "sending the differences," means "sending only the differences."

RIM relies on a prosecution history argument in support of its construction.   During prosecution, the applicants urged the patentability of one of the method claims (pending claim 83) over the Salesky reference.  Pending claim 83 was a method claim which contained the limitation "sending the differences from the global server to the second device."  The applicants argued that:

> Respectfully, Salesky quite simply teaches sending ALL of a first device data to a second device, which data is captured from the first device display, while the present invention at least contrastingly DETERMINES DIFFERENCES between first and second device workspace data and stores at the global server and sends to the second

> device only the DIFFERENCES.  The present invention is therefore unobvious over
> and far more efficient than Salesky for at least this reason.

Amendment and Response mailed July 2, 2003, at 9-10 (capitalization and underlining in original).

Visto contends that this statement was addressed to a method claim, as opposed to the system claim at issue here.  Visto argues that it made different arguments directed toward the patentability of pending claim 90 (the system claim), which included the limitations "means for storing the differences at a global server" and "means for sending the differences from the global server to the second device."  The court rejects this position.  The claim language at issue in the method and system claims is sufficiently similar to require that the disclaimer directed to the method claim carry over to the corresponding system claim.  *Southwall Techs, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995) ("Arguments made during prosecution regarding the meaning of a claim term are relevant to the interpretation of that term in every claim of the patent absent a clear indication to the contrary.").

Visto alternatively argues that the claim is drafted in means-plus-function form, and the court has previously determined what structure corresponds to the claimed function.  Visto notes that the parties agree as to the corresponding structure.  *See* Joint Claim Construction Statement, at 3-4.  The structure corresponding to the "means for storing" is the general synchronization modules 410 and 825, the content-based synchronization module 830, and the data storage device 350 on the global server.  The structure corresponding to the "means for sending" is the general synchronization modules 410 and 825, the content-based synchronization module 830, and the communications module 805.  According to Visto, RIM's position would allow the court to define the corresponding structure in a patent and then change the construction of the function performed by the structure.

16

Visto's argument is correct as a general rule, but it does not alter the result in this case. Identification of corresponding structure requires the court to construe the function and then examine the specification to locate the structure that performs the function.  In view of the patentees' unequivocal statements during prosecution, the court construes the function to require the storing and sending of only the differences between the first and second workspace data.  The previously identified corresponding structures remain the same in view of the court's functionality clarification. In accordance with this discussion, the court determines that RIM's proposed limitations are appropriate, and adopts RIM's proposed constructions for these terms.

**4.      synchronize; synchronizing; order of steps**

Judge Ward previously construed the term "synchronizing" to mean "providing for data consistency by reconciling modifications to stored information."  *See Visto Corp. v. Smartner Info. Sys., Ltd.*, No. 2:05-CV-91, slip op. at 2-3 (E.D. Tex. Dec. 29, 2006).  Visto urges the undersigned to adopt Judge Ward's construction for these terms.  RIM's proposed construction is "comparing sets of stored data to determine if reconciliation between them is needed, and if so, providing for data consistency by reconciling modifications to those stored data.  Synchronization assures that data at two different locations are either identical or the differences known."

A subsidiary issue exists regarding the order of steps of claim 17 of the '708 patent.  RIM contends that the language of the claim requires that the steps of accessing workspace data and synchronizing the workspace data be performed in the order recited in the claim.  In *Visto v. Good Tech., Inc.*, the court addressed a similar issue with respect to certain claims of the '192 patent. Those holdings are incorporated by reference herein.  However, nothing in the language of claim 17 of the '708 patent requires the ordering that RIM proposes.  For essentially the reasons stated in

Visto's reply brief, the court is not persuaded that the steps of claim 17 must be performed in any particular sequence.  The court defines "synchronize" to mean "to provide for data consistency by reconciling modifications to stored information."

**5.      content-based synchronization module**

This term appears in claims 13 and 29 of the '708 patent.  Visto's proposed construction for this term is "software routines or code that perform the task of reconciling differences between two or more versions of a workspace element."   RIM's counter-construction is "software routines or code that perform the tasks of examining data content to determine if conflicting modifications were made and integrating modifications that do not conflict."

In the specification, the patent provides:

The content-based synchronization module 430 includes routines for reconciling two or more modified versions of a workspace element.  For example, if a user has independently modified the original and the copy of a workspace element since the last synchronization, then the content-based synchronization module 430 determines an appropriate responsive action.  The content-based synchronization module 430 may request the user to select a preferred one of the modified versions or may respond based on preset preferences, i.e., by storing both versions in both stores or preferably by integrating the modified versions into a single preferred version which replaces each modified version at both stores.

The content-based synchronization module 430 examines the changes made to each version and determines if conflicts exist.  When implementing version integration, a conflict may arise if inconsistent modifications such as deleting a paragraph in one version and modifying the same paragraph in the other version have been made.  If a conflict exists, then the content-based synchronization module 430 attempts to reconcile the conflict, e.g., by requesting user selection or by storing both versions at both stores.    Otherwise, if no conflict exists, then the content-based synchronization module 430 integrates the changes to each of the versions and updates the version information 148, 150 or 255 accordingly.

'708 patent at 7:58-8:15.

18

As a result, the content-based synchronization module in the claims generally refers to "software routines or code that perform the task of reconciling differences between two or more modified versions of a workspace element." RIM's additional limitations are unnecessary, primarily because claim 13, in which the term appears, depends from claims 10 and 11, and claim 10, in turn, depends from claim 1. Claim 11 requires the module to examine content of the first and second workspace element when both have been modified since the last synchronization. Claim 13 adds the additional limitation that the module integrate modifications made to each element when no conflicts exist. Accordingly, the court defines this term to mean "software routines or code that perform the task of reconciling differences between two or more versions of a workspace element."

### 6.    conflict

Visto contends that no construction of this term is necessary. Visto suggests that the term simply means "a state of disagreement and disharmony." RIM's proposed construction is "inconsistent modifications to corresponding data." RIM contends that a construction is needed to clarify the definition of a conflict in view of the asserted claims. In its reply brief, Visto contends that RIM is importing limitations from the preferred embodiment into the definition of conflict.

As indicated in the portion of the specification cited above, the word "conflict" describes, for example, the situation that exists when inconsistent modifications to workspace elements have occurred. In particular, the relevant passage states: "[w]hen implementing version integration, a conflict may arise if inconsistent modifications such as deleting a paragraph in one version and modifying the same paragraph in the other version have been made." '708 patent at 8:6-9. Although this passage of the specification describes particular embodiments, the court concludes that it also accurately captures the definition of the word "conflict" as used in the asserted claims. Specifically,

the claims relate to the situation in which two workspace elements have been modified, the content-based synchronization module has examined the content of the elements to determine whether conflicts exist, and, if not, then the module integrates the changes made to each workspace element. As such, the court defines "conflict" to mean "inconsistency."

### 7.    Means-Plus-Function Limitations[6]

### a.    Previously Construed Means-Plus-Function Limitations

The court has carefully reviewed the prior constructions for the following terms in view of RIM's current claim construction arguments and concludes that the previous constructions are correct.  The court therefore adopts the following constructions from previous litigations.

| Means-Plus-Function Limitation | Court's Construction |
|---|---|
| synchronization means | The corresponding structure for this means-plus-function limitation includes the base system 400 (and 146) and the synchronization agent 124. |
| means for storing first workspace data on a first device | The corresponding structure for this limitation includes the data storage devices 250, 350, and 720. |
| means for storing second workspace data on a second device | The corresponding structure for this limitation includes the data storage devices 250, 350, and 720. |
| means for generating a preferred version from the first workspace element and from the copy based on the first and second examination results | The corresponding structure for this limitation is the general synchronization module 425. |
| means for updating the first version information whenever the first workspace element is modified | The corresponding structure is the service engine 245 and desktop service engine 345. |

---

[6]    By statute, the court construes all of the means-plus-function limitations to cover the structure identified in the specification and equivalents.

| Means-Plus-Function Limitation | Court's Construction |
|---|---|
| synchronization means | The corresponding structure for this means-plus-function limitation includes the base system 400 (and 146) and the synchronization agent 124. |
| means for updating the first version information whenever the first workspace element is modified or updating the second version information whenever the copy is modified | As discussed in the court's previous order, the court is inclined to recommend that this limitation, and claim 21, are indefinite for lacking corresponding structure. |
| means for executing a workspace data manager on an untrusted client site | The claimed function is executing a workspace data manager on an untrusted client site.<br><br>The corresponding structure is the processor 405 and the operating system 440. |
| means for requesting the workspace data manager to access data temporarily from a remote site | The corresponding structure is software routines performing steps 810 and 815 of the "borrow me" functionality depicted in Fig. 8. |
| means for downloading data from the remote site | The corresponding structure is the communications module 705. |
| means for placing the data in temporary storage on the untrusted client site | The specific function claimed is placing data in temporary storage on the untrusted client site.<br><br>The corresponding structure is the instantiator 730. |
| means for using the workspace data manager to present the downloaded data | The corresponding structure is the assistant 175, 180, 185, 260, or 700. |

**b.      translator for translating**

RIM contends that the interpretation of this term is governed by § 112 ¶ 6.  The court rejects

RIM's contention in view of the above construction of the terms "translator" and "translating."

### B.      The RIM Patents-in-Suit

The court now turns to the patents asserted by RIM in its counterclaim.  RIM has asserted

various claims of the '694 patent and the '457 patent.  The '457 patent is a continuation of the '694

patent, and the two patents therefore share a common specification.  Unless otherwise indicated,

citations are to the specification of the '694 patent.

The RIM patents disclose and claim methods for redirecting messages from a host system

to a mobile device.  As reflected by the title of the patents, the technology employs a "push"

paradigm.[7]  A "redirector" program operating at the host system "pushes" information to a mobile

data communication device upon sensing a triggering event.  '694 Patent, Abstract.  Instead of

warehousing (or storing) a user's data items at the host system and then "synchronizing" the mobile

data communications device to data items stored at the host system, the invention continuously

packages and retransmits certain user-selected items of information to the mobile device.  '694

Patent at 1:26-34.

Using the redirector program, the user can select certain data items for redirection, such as

e-mail messages, calendar events, meeting notifications, and other data items.  '694 Patent at 3:28-

32.  Having selected such items, a user can then configure one or more triggering events to be sensed

by the redirector program to initiate redirection.  '694 Patent at 3:32-34.  A triggering event might

include, for example, a request from a mobile device to initiate redirection.  '694 Patent at 3:36-37.

Once an event has triggered redirection of the user data items, the host system repackages those

items in a manner that is "transparent" to the mobile data communication device, so that information

on the device appears similar to information appearing at the host.  The preferred repackaging

---

[7]      The title of the '694 patent is System and Method for Pushing Information from a
Host System to a Mobile Data Communication Device Having a Shared Electronic Address.

method includes wrapping the user data items in an e-mail envelope that corresponds to the address of the mobile data communications device. '694 Patent at 3:66-4:6. The repackaging preferably results in e-mail messages generated by the user from the mobile device to be transmitted from the host system, thus enabling the user to appear to have a single e-mail address, such that the recipients of the messages sent from the mobile device do not know where the user was physically located. '694 Patent at 4:9-16. A similar redirector program can be installed on the user's mobile device, such that information generated at the mobile device is pushed to the host upon detecting a triggering event. '694 Patent at 4:39-49.

Claim 1 of the '694 patent is an illustrative independent claim:

A method of redirecting messages between a host system and a mobile data communication device, comprising the steps of:

configuring one or more redirection events at the host system;

detecting that a redirection event has occurred at the host system and generating a redirection trigger;

receiving messages directed to a first address at the host system from a plurality of message senders;

in response to the redirection trigger, continuously redirecting the messages from the host system to the mobile data communication device;

receiving the messages at the mobile data communication device;

generating reply messages at the mobile data communication device to be sent to the plurality of message senders and transmitting the reply messages to the host system;

receiving the reply messages at the host system and configuring address information of the reply messages such that the reply messages use the first address associated with the host system as the originating address, wherein messages generated at either the host system or the mobile data communication device share the first address; and

transmitting the reply messages from the host system to the plurality of message senders.

'694 Patent, claim 1.

The parties propose several terms for construction from the '694 and the '457 patents.  These are discussed in turn.

### 1.      redirecting; redirection

RIM proposes that these terms embrace the "process of responding to a new data item received at the host system by preparing the data item for retransmission and then retransmitting the data item from the host system, where the process is essentially transparent to the message recipient and/or user of the mobile communication device."  Visto urges that the terms mean "process of responding to a new message received at the host system by preparing the message for retransmission and then retransmitting the message from the host."

There are two disputes between the parties.  First, RIM seeks to make clear that the claim embraces "data items" and not simply e-mail messages.  Visto counters that RIM disclaimed data items during prosecution.  Second, RIM asks the court to include the concept of "transparency" in the construction of "redirection."  Visto responds by pointing to other claim language, as well as the prosecution history, which suggest that RIM's limitation is unnecessary and/or improper.

With respect to the first issue, the court agrees with RIM that the claim is not limited to e-mail messages.  Instead, the language of the claims, the specification, and the prosecution history all support the conclusion that Visto's arguments are misplaced.  First, the language of the claims refers to "messages."  *See, e.g.*, '649 Patent, claim 1 ("[I]n response to the redirection trigger, continuously redirecting the messages from the host system to the mobile data communication device.").  Although this language, read without resort to the specification, might support Visto's position, the specification uses the terms "messages" and "data items" interchangeably.  *Compare*

24

'649 patent at 3:8-12 ("Using the redirector program, the user can select certain *data items* for redirection, *such as E-mail messages*, calendar events, meeting notifications, address entries, journal entries, personal reminders etc.") (emphasis added), *with* '649 patent at 12:29-33 ("A *message* could be an *E-Mail message or some other user data item* than [sic] may have been selected for redirection . . . .") (emphasis added).  These passages in the specification indicate that a "message" as used in the claim is not limited to an e-mail message.

Visto points to the prosecution history in support of its argument.  During prosecution, the applicants amended the claims to replace the term "data item" with "message."  These portions of the prosecution history, however, do not support a conclusion that RIM clearly and unmistakably disclaimed data items other than e-mail messages.  The applicants referred to "messages" as embracing both data items and e-mail messages in the specification.  As such, RIM's use of the term "messages" in the claims does not amount to a disclaimer, particularly when the specification makes plain that the applicants distinguished "messages" from "e-mail messages."  The former term has a broader scope than the latter.  Had the applicants desired to narrow the scope of the claims to e-mail messages, they would have used the narrower term.  Consequently, the court rejects Visto's prosecution history argument.

Next, the court turns to RIM's attempt to impose a transparency limitation into the scope of the term "redirection."  It is true that the specification repeatedly refers to the concept of transparency.[8]  The problem with RIM's argument, however, is that other claim language describes

---

[8]        *See, e.g.*, '694 Patent at 3:66-4:3 ("Once an event has triggered redirection of the user data items, the host system then repackages these items in a manner that is transparent to the mobile data communication device, so that information on the mobile device appears similar to information on the user's host system."); '694 Patent at 4:10-13 ("The repackaging preferably results in E-mail messages generated by the user from the mobile device to be transmitted from the host system, thus enabling the user *to appear* to have a single E-mail address . . . .") (emphasis added); '694 Patent

the concept of transparency as disclosed in the specification.  As issued, claim 1 includes the limitation:

> receiving the reply messages at the host system and configuring address information of the reply messages such that the reply messages use the first address associated with the host system as the originating address, wherein messages generated at either the host system or the mobile data communication device share the first address.

'694 Patent, claim 1.  The concept of a shared address for both the host computer as well as the mobile device was one of the features that gave the invention a transparent quality, as both the user and third parties would need to learn only one address.

Other claims include similar features relating to "transparency" as described in the specification.  For instance, dependent claim 7 includes the additional limitation:

> after receiving the redirected messages at the mobile data communication device, extracting the messages from the electronic envelopes and displaying the messages at the mobile data communication device using the sender address and the receiver address, so that it appears as though the mobile data communication device is the host system.

'694 Patent, claim 7.  This language specifically claims the patentee's description of "transparency" as it relates to the user of the mobile device and the host system.  Likewise, claim 23 includes the limitations:

> receiving the reply messages at the host system and configuring the reply messages using the first email address for the user of the mobile data communication device

---

at 2:42-45 ("There remains still another need for such a system and method that provides for secure, transparent delivery of the user-selected data items from the host system to the mobile device."); '694 Patent at 10:15-20 ("These additional components are illustrative of the type of event-generating systems that can be configured and used with the redirector software 12, and of the type of repackaging systems that can be used to interface with the mobile communication device 24 to make it appear transparent to the user."); '694 Patent at 13:67-14:7 ("As described above, the redirector program 12 executing at the desktop system then strips the outer envelope and routes the reply message to the appropriate [recipient] . . . so that to the recipient of the redirected message, it appears as though it originated from the user's desktop system rather than the mobile data communication device.").

as the address originating the reply messages, wherein messages generated at either the host system or the mobile data communication device share the first email address; and

transmitting the configured reply messages from the host system to the plurality of message senders.

'694 Patent, claim 23.

These limitations describe the concept of transparency as to third-parties suggested by the specification.  The language of these claims indicates that the applicants claimed the concept of transparency as disclosed by the specification.  Therefore, it would be improper to include the concept of "transparency" in the definition of "redirection."  The parties otherwise agree on the definition of redirection, and further construction is unnecessary.

### 2.      host system

RIM proposes that this term means "computer system where the redirector software is operating that also includes a memory store where data items are normally stored."  Visto proposes two constructions, one for the '694 patent and one for the '457 patent.  For the '694 patent, Visto contends that the term means "the computer where the redirector software is operating that also includes the primary data store for user messages."  For the '457 patent, Visto proposes "a desktop networked computer where the redirector software is operating that also includes the primary data store for user data items."  The parties dispute, generally, whether the host system may include multiple computers and whether the data store included in the host system must be the primary data store.

The patent indicates that the host system may be comprised of more than one computer.  The plain language of the word "system" supports this view.  In addition, the specification of the '694 patent indicates:

> As used in this application, the term "host system" refers to the computer where the redirector software is operating.  In the preferred embodiment of the present invention, the host system is a user's desktop PC, although, alternatively, the host system could be a network server connected to the user's PC via a local-area network ("LAN") [sic], or could be any other system that is in communication with the user's desktop PC.

'694 Patent at 2:53-60.  This passage indicates that the term "host system" is not limited to a single computer.

The specification also references the fact that the host system is the primary location where a user's data items are stored.  In particular, the specification provides that the host system includes "a primary memory store where the user's data items are normally stored." '694 Patent at 3:7-8; 1:9-11 ("The present invention is directed toward the field of replicating information from a host system where the information is normally stored . . . .").  Although Visto seeks to limit the scope of the claims to e-mail messages, the court has previously rejected this limitation.  Thus, the host system is the primary location where a user's data items are stored.

Finally, Visto has proposed a separate construction of the term as used in the '457 patent.  Under Visto's view, the host system of the '457 patent is limited to a desktop networked computer.  Visto relies on the language of the preamble of claim 1, which states "[a] method of mirroring data items between a host system and one or more mobile communication devices, *wherein the host system is a desktop networked computer*, comprising the steps of:." '457 Patent, claim 1 (emphasis added).  Similar language appears in the other independent claims of the '457 patent.  Because RIM appears to concede that the quoted portion of the preamble is a claim limitation, RIM's Reply Brief at 9 & n. 8, it is not necessary to include the additional limitation in the construction of "host system."  The court construes "host system" to mean "computer system where the redirector software is operating that also includes the primary memory store where a user's data items are

28

stored."

### 3.    mobile device terms

The patents use the terms "mobile data communication device" and "mobile communication device."  RIM equates the two terms and argues that they mean "a portable communication device that is capable of sending and receiving data items via a wireless network connection."  Visto contends the two terms mean something slightly different.  As to "mobile data communication device," Visto proposes "a portable device that is capable of sending and receiving messages via a network connection including a wireless connection."  With respect to "mobile communication device," Visto proposes "a portable device that is capable of sending and receiving data items via a network connection including a wireless connection."  The primary dispute is whether the mobile data devices must be wireless communication devices.

The claim language refers to "mobile" communication devices.  By emphasizing the mobility of the device, the claims suggest that the device be capable of wireless communication.  The specification supports this view, stating:

> The preferred mobile data communication device 24 is a hand-held two-way wireless paging computer, a wirelessly enabled palm-top computer, a mobile telephone with data messaging capabilities, or a wirelessly enabled laptop computer, but could, alternatively be other types of mobile data communication devices capable of sending and receiving messages via a network connection 22.

'694 Patent at 6:31-37.  The specification also indicates that network connection 22 is a wireless network.  '694 Patent at 7:4, 13:13-14, and 13:62.  Although these portions of the patent deal with preferred embodiments of the invention, it is noteworthy that each of the listed devices is a small, portable device that is capable of wireless communication.  As a result, the court construes the term "mobile data communication device," as used in the claims of the '694 patent, to mean "a portable

communication device that is capable of sending and receiving data items wirelessly."

The claims of the '457 patent refer to a "mobile communication device."  Although the language is slightly different, Visto's brief concedes that the mobile communication device of the '457 patent should be construed to cover "data items."  *See* Visto's Response at 25 n. 22.  As such, the court construes this term to mean "a portable communication device that is capable of sending and receiving data items wirelessly."

### 4.     redirection event(s)

RIM proposes that this term means "internal, external or network event(s), the occurrence of which generates a redirection trigger."  Visto contends that this term means "internal, external or network event(s), defined by the user at the host system or the mobile data communication device, the occurrence of which generates a redirection trigger."  The dispute between the parties is whether the user must define the redirection event and whether it may be defined at the host system or the mobile data communication device.

Visto argues that certain portions of the specification and the prosecution history support its construction.  The court has reviewed the cited portions of the specification and the prosecution history, bearing in mind that "redirection event" has no accepted meaning in the art.  Although the intrinsic record refers to an embodiment of the invention as including user-defined events, *see* '694 Patent at 3:12-30, the language of the claims refers to the concept of "configuring" redirection events.  *See* '694 Patent, claim 1.

During prosecution, the applicants emphasized the importance of configuring redirection events:

> Beletic does not teach the step of configuring one or more redirection events at the host system.  In Beletic, the only host system is the remote messaging system 30.

> There is no teaching in Beletic of configuring a redirection event at the remote messaging system 30.

'694 File History, 5/15/2000 Amendment at 8.  This portion of the prosecution history, however, is consistent with the language of issued claim 1, and does not require the redirection event to be "user-defined."

> In addition, the applicants urged that:

> The network server includes a profile for each user that is authorized to have messages redirected through the system.  The profile associates the user's desktop system with their mobile data communication device.  Each of the users configures one or more redirection events at their own desktop system, such as a screen saver, calendar alarm, sensing whether the user is in the vicinity of the desktop system, etc.

'694 File History, 10/6/2000 Amendment at 28.  This language discusses a user "configuring" a redirection event at a desktop system, but it does not amount to a clear disavowal of a system that does not include "user-defined" redirection events.

Finally, Visto argues that the court should make it clear that the redirection event may be defined at the host computer or the mobile data communication device.  The court rejects this argument.  Such a definition conflicts with the language of the claims, which specifies the location of the configuration.  *See, e.g.*, '694 Patent, claim 1 ("configuring one or more redirection events *at the host system*") (emphasis added).  The court therefore defines this term to mean "internal, external or network event(s), the occurrence of which generates a redirection trigger."

### 5.    redirection trigger

RIM contends that this term means "a signal to initiate redirection of data items."  Visto contends that the term means "a message or signal generated in response to a redirection event that initiates redirection."  The court has reviewed the parties' briefs and is persuaded that RIM's construction of this term is proper.  The court therefore defines this term to mean "a signal to initiate

redirection of data items."

### 6.     internal, external and networked events

RIM contends that these terms mean, respectively, "event internal to the host system," "event external to the host system," and "event from a computer coupled to the host system via a network." Visto contends that the terms mean, respectively, "a user-defined event that is internal to the host system, which initiates redirection," "a user-defined event that originates from outside the host system, which initiates redirection," and "a user-defined event that is transmitted to the host system from another computer coupled to the host system via a network, which initiates redirection." Consistent with the constructions announced above, the court defines "internal event" to mean "event internal to the host system, the occurrence of which generates a redirection trigger."  The court defines "external event" to mean "event that originates from outside the host system, the occurrence of which generates a redirection trigger."  Finally, the court defines "networked event" to mean "event from a computer coupled to the host system via a network, the occurrence of which initiates redirection."

### 7.     the shared address terms

The next area of dispute involves the "shared address" terms.  For example, claims 1, 23, and 32 of the '694 patent use the term "messages generated at either the mobile data communication device or the host system share the first address."  RIM argues that this term means "a message generated at the mobile data communication device appears to the message recipient to have the same 'from' messaging address as a message generated at the host system."  Visto argues the term means "messages when generated at either the mobile data communication device or the host system have the same address, which is the first address."  Similar limitations appear in claims 22, 24, and

32 of the '694 patent, and the parties' disputes are consistent in those contexts as well.

RIM points to the specification, which explains:

As described above, the redirector program 12 executing at the desktop system then strips the outer envelope and routes the reply message to the appropriate destination address using the address of the desktop system as the "from" field, so that to the recipient of the redirected message, it appears as though it originated from the user's desktop system rather than the mobile data communication device.

'694 Patent at 13:67-14:7.

Visto argues that, during prosecution, RIM amended claim 1 of the '694 patent in a manner that disclaimed the transparency limitation RIM seeks in its claim construction. Specifically, Visto observes that claim 1 of the '694 patent included the limitation "so that the reply messages appear to have been generated at the host system instead of at the mobile device," and the applicants replaced the language with the "share the same address" language found in the claims. According to Visto, this amendment requires the host system and the mobile device to have the same actual address, as opposed to the embodiment described above, where the two appear to have the same address to a third-party message recipient.

The court is not persuaded by this argument. As RIM argues in its reply brief, the amendment to claim 1 does not reflect a disclaimer of the transparency concept. RIM argued to the examiner that its invention was patentable over the prior art precisely because of the transparency concept expressed in various ways throughout the claims. Moreover, it appears that the language of claim 1 was included after the examiner informed RIM that pending claim 73 (which used similar language) was in a condition for allowance. The language of issued claim 1 is consistent with the cited portion of the specification, as claim 1 provides for "configuring address information of the reply messages such that the reply messages use the first address associated with the host system as

the originating address, wherein messages generated at either the host system or the mobile data communication device share the first address . . . ."  '694 Patent, claim 1.  In view of the court's determination that RIM did not surrender the transparency concept through prosecution, the court construes this term to mean "a message generated at the mobile data communication device appears to the message recipient to have the same 'from' messaging address as a message generated at the host system."

### 8.      first address; first email address

RIM argues that "first address" means "a user's messaging address."  RIM also argues that "first email address" means "a user's email address."  Visto argues that the terms should be construed as "a particular user's host system address or host system email address."  Although Visto argues that RIM disclaimed the "transparency concept" during prosecution, the court agrees with RIM that the prosecution history, read as a whole, reveals no such disclaimer.  Moreover, the court agrees with RIM that Visto's proposed constructions of these terms lead to awkward results when read in the context of the claims as a whole.  After considering the briefing and the intrinsic record, the court is persuaded that "first address" means "a user's messaging address."  Likewise, the court construes the term "first email address" to mean "a user's email address."

### 9.      continuously redirecting

Next, the parties dispute the meaning of the language "continuously redirecting."  RIM suggests that no construction is necessary.  Visto, however, proposes that the term means "in response to the redirection trigger, redirecting all user selected messages as each new message is received by the host system."  Visto supports its argument by pointing to the prosecution history of the PCT application.  RIM argues that this construction is improper, in part because it imposes a

requirement that the user select the messages for redirection.

>    At oral argument, RIM's counsel indicated that the construction sought by RIM was that:
>
>    once the trigger is set . . . just to continue to redirect the message.  The point is, I
>    don't have to set a new trigger for each–before each message comes.  I set the
>    trigger, and after that, continue to redirect.

Tr. of Claim Construction Hearing at 98.  In the context of these claims, the court agrees with this

view of continuously redirecting.  As such, the court defines "continuously redirecting" to mean

"redirecting all messages in response to the redirection trigger."  The court rejects Visto's effort to

impose the "user selected" limitation into this claim term.

### 10.    message sender's email address associated with the host system

This phrase appears in claim 24 of the '694 patent.  Although RIM contends that no

construction is necessary, it does not offer any argument in opposition to Visto's suggestion that the

court should clarify that it is the message sender's host system email address that is referenced by

this limitation.  As such, the court construes this term to mean the "message sender's host system

email address."

### 11.    originating address terms

The term "originating address" appears in claims 1, 22, 23, 28, 32, and 33.  As an example,

claim 1 provides for "configuring address information of the reply messages such that the reply

messages use the first address associated with the host system as the originating address, wherein

messages generated at either the host system or the mobile data communication device share the first

address." Visto asks the court to clarify the term "originating address" in the context of claim 1 to

clarify that the originating address is "an address that identifies the sender of the reply messages to

the message recipient."  RIM argues that the court should adopt the plain meaning of these terms,

but it does not argue that Visto's construction improperly limits the scope of the claims.  The court has reviewed Visto's proposed constructions in light of the claim languages and concludes they are correct.  As such, the court adopts Visto's constructions for these terms.

12. **information regarding the configuration of the mobile data communication device**

This phrase appears in claim 2 of the '694 patent.  RIM contends that no construction is necessary.  Visto argues that the phrase means "information about the mobile communication device, configured by its user that includes the type of mobile data communication device, its address, preferred message types for redirection, and types of message attachments that the mobile communication device can receive and process."  In support of its construction, Visto points to language in the specification suggesting that the user initially configures, at the host system, a particular device's capability to receive and process attachments, '694 Patent at 3:43-48, and a separate portion describing the programming of the redirector.  '694 Patent at 7:57-63.  RIM opposes Visto's construction on the grounds that it seeks to limit the scope of the claims to the particular embodiments described in the specification and that those limitations are captured in dependent claims.

The court agrees with RIM.  Dependent claim 3 requires that the configuration information stored at the host includes (a) the network address of the mobile data communication device, and (b) an indication of the types of message attachments that the mobile data communication device can receive and process.  Dependent claim 4 requires the storage of the information recited in claim 3, as well as an indication of the type of mobile data communication device.  To include these same limitations within the scope of claim 2 would be improper.  Likewise, the claim language does not require the "user" to configure the mobile data communication device.  As a result, the court is

persuaded that Visto's limitations are improper.  No further construction of this term is required.

**13.    redirector component**

Claims 24, 28, and 33 of the '694 patent include the term "redirector component."  The parties dispute whether this term is drafted in means-plus-function form.  Visto contends that it is, and argues that the corresponding structure is "redirection software 12 running on the host system 10 which performs the algorithm of FIG. 4."  RIM contends that the term is not drafted in means-plus-function form.

If claim language does not use the word "means," it is presumptively not subject to means-plus-function construction under § 112 ¶ 6.  *Watts v. XL Systems, Inc*., 232 F.3d 877, 880-81 (Fed. Cir. 2000).  In claim 24, a system claim, the complete limitation reads:

> [A] redirector component operable with the host system that upon receiving a message generated at the mobile device, by a message sender destined for a message recipient, configures address information of the received message, prior to redirection to the message recipient, such that the received message uses the message sender's email address associated with the host system, thereby allowing messages generated at either the mobile device or host system to share the message sender's email address associated with the host system.

'694 Patent, claim 24.

Reading the limitation as a whole, and in light of the applicable presumption, the court concludes that the term "redirector component" is not drafted in means-plus-function form.  It bears mention that Visto has taken a consistent position in construing its own patents, by advocating that various "modules" are not subject to § 112 ¶ 6.

### 14.      desktop networked computer

The claims of the '457 patent includes a limitation that the host system be a desktop networked computer.  The parties dispute the scope of this limitation.  Visto seeks to limit the term to "a user's personal computer ("PC") connected to a local-area network ("LAN")."  Visto argues that the specification discloses a desktop system connected to a LAN, but does not disclose a desktop computer connected to a wide area network or the Internet.  RIM seeks a construction of the term to mean "a personal computer connected to a network."  RIM's construction would embrace desktop computers that are connected to the Internet, and RIM supports its construction by pointing to the fact that the language of the claim is not restricted to LANs.

After considering the parties' positions, the court determines that the patent claim is not restricted to desktop PCs that are connected to LANs.  Rather, the court concludes that the scope of the claim includes desktop personal computers connected to any type of network, including the Internet.  The court does, however, clarify that this term is limited to a PC, as opposed to a network server.  The court therefore construes this term to mean "a desktop personal computer ("PC") connected to a network."

### 4.      Conclusion

The court adopts the above constructions.  The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the constructions adopted by the court.

SIGNED this 30th day of April, 2008.


CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE